14462

CULLER v. GREAT ATLANTIC & PACIFIC TEA COMPANY ET AL.

(191 S. E., 67)

March, 1936.

*Mr. L. A. Hutson,* for appellant

*Messrs. W. C. Wolfe, Julian S. Wolfe, M. A. Zeigler* and *J. M. Brailsford, Jr.,* and *W. B. Martin,* for respondents,

April 12, 1937.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This is an action for damages on account of certain alleged slanderous words claimed to have been spoken of and concerning the plaintiff by the defendant Sprouse, while acting within the scope of his authority as agent of his co-defendant, the Great Atlantic & Pacific Tea Company.

The following is contained in the complaint:

"That on or about September 27, 1935, the plaintiff, Mrs. Gertrude Elizabeth Culler, with her husband, J. W. Culler, called at one of the grocery stores of the defendant, The Great Atlantic & Pacific Tea Company, in the City of Orangeburg, South Carolina, at which she had been trading for some length of time, to purchase a few groceries; that after placing an order for the groceries, she purchased two cold drinks from C. L. A. Carter, one of the assistant managers in charge of the store, and informed him that she was not accustomed to drinking from the bottle, and if it was all right, she and her husband would walk back to the rear of the store, that was separated from the front by shelves about four feet high on which groceries are placed, and open lattice work reaching to the ceiling, having a large door through which to enter into the rear of the store; that

they were informed that it was perfectly all right, and the assistant manager, Mr. C. L. A. Carter, showed them back into the rear of the store, and before going back to the front exchanged a few words with the plaintiff and her husband while they were drinking the cold drinks.

"That after the plaintiff and her husband had finished with the cold drinks, they walked back to the front of the store, secured and paid for the groceries that they had ordered and went out, that a few seconds after they stepped out of the store, the defendant, J. M. Sprouse, agent and general manager in charge of the store of the defendant, The Great Atlantic & Pacific Tea Company, in a deliberate, harsh, malicious, insulting way, in the presence of a number of others in the said store, in a loud, harsh tone of voice, called the assistant manager, Mr. C. L. A. Carter, of the defendant, the Great Atlantic & Pacific Company, and said: 'Jack, come here. Jack, who in the hell was that God damn woman in here just now?' and was told by the assistant manager: 'She is Mrs. Julian Culler, a good customer of the store. She is buying groceries.' That the said agent and general manager, J. M. Sprouse, of the defendant, The Great Atlantic & Pacific Tea Company, in charge of its business, acting for it at its special instance and request, jointly for himself and the defendant, The Great Atlantic & Pacific Tea Company, replied in the said malicious, insinuating, harsh way, 'What in the God damn hell is she hanging around here for? It don't seem like it would take her all the God damn day to do her trading. She was in the store when I was here this morning, and she is still here.' "

It was further alleged "that the defendants, by the said language and conduct, charged the plaintiff with the crime of immorality, and with being lewd, unchaste and a woman of bad character, and the said language and conduct was so understood by those who were present and heard the malicious, untrue, harsh, unjust accusations." The answers were a general denial.

The case was tried in March, 1936. At the close of all the testimony counsel for defendants moved for a directed verdict on the ground that the words alleged in the complaint were not susceptible of the meaning ascribed to them by the plaintiff, and that the testimony offered in support of such allegations did not make out a case of actionable slander. The motion was granted, and the plaintiff excepts and brings error.

Only one question is presented by the appeal, Did the Court err in directing a verdict?

As is seen from an examination of the complaint, the alleged defamatory language does not charge the plaintiff, *totidem verbis,* with being unchaste. It was necessary, therefore, that an innuendo be pleaded in order "to connect the defamatory matter with other facts and circumstances sufficiently expressed before, for the purpose of showing the meaning and application of the charge." 37 C. J., 24. This the plaintiff sought to do by alleging that the defendants, by the use of such language, under the facts and circumstances detailed, charged her with being an unchaste woman.

The following definition of the innuendo is given in Newell on Libel and Slander, at page 588: "An innuendo in pleading is an explanation of the defendant's meaning by reference to some antecedent matter * * * but it cannot add or enlarge, extend or change the sense of the previous words, and the matter to which it alludes must always appear from the antecedent parts of the pleading. It is necessary only when the intent may be mistaken or where it cannot be collected from the defamatory matter itself. It is a statement by the plaintiff of the construction which he puts upon the words himself, and which he will endeavor to induce the jury to adopt at the trial."

The defendants did not demur to the complaint, but, as we have said, answered and went to trial upon the issues as made by the pleadings. The husband of the plaintiff testified

that, "I gave the A & P store at the railroad practically all of my business"; that he was there on the morning of September 27, 1935, about ten o'clock, and that his wife, who was a government employee in the county, was with him; that, after making some purchases, they left but went back about 12 o'clock to get something for dinner; that he bought Coca-Cola for his wife and beer for himself from the local manager, C. L. A. Carter, and asked him if he objected to their stepping behind a partition, a short way back in the store, to drink it; that when they first went there that morning, he saw the defendant Sprouse, and saw him again at noon when the witness and his wife came out of the store after they had had their drinks. He further testified that while he was at the store on the next day, Saturday, the local manager suggested that when the wife of the witness came in again to get a cold drink, she should not go to the rear to take it, as a terrible remark had been made about her the day before; and that Carter then told him what the remarks were and who had made them. He also said that he later had an opportunity to see Sprouse about the matter, who did not deny having made the remarks, but claimed that he did not mean any disrespect. The plaintiff corroborated the statements of her husband with regard to their being in the store on Friday, September 27, 1935, and that they, with the permission of the local manager, had taken their drinks behind the partition referred to. She further stated that she had never met Sprouse and that he did not know her personally.

Carter testified that he was the local manager of the store out at the railroad, there being two A & P stores in the city, and that the defendant Sprouse was a district manager; that the plaintiff and her husband were at the store on the date in question, about 10 o'clock in the morning, and that Sprouse came in at the time and was there when they left; that they returned "about noon, bought two drinks and asked if they could step in the back, as Mrs. Culler did

not want to drink out there in public," and that the witness gave them permission to do so, as had been his custom and practice; and that Sprouse, who was putting a sign on the window, came in while the plaintiff and her husband were in the back. Carter then testified:

"Q. What did Mr. Sprouse say to you? A. He called me to the front of the store, said, 'Jack, come here a minute.' I went. I said, 'Yes, sir; Mr. Sprouse.' He said, 'Who in the hell is that God damn woman in here?' I said, 'Mrs. Julian Culler.' He said, 'What the God damn hell she doing hanging around here?' I said, 'Buying groceries.' He said, 'Take all day to buy groceries; she was in here this morning when I was here and is still here?' "

Carter further stated that Sprouse spoke in a harsh tone of voice, and that the impression made upon the witness was that he meant to imply that the plaintiff "was hanging around the store, and that she was an unmoral and unchaste woman."

John Hewitt, also an employee of the company, testified that he was present and heard the defendant Sprouse make the remarks concerning the plaintiff substantially as testified to by Carter; and that the impression was made upon him, by the manner in which Sprouse spoke, that the plaintiff was "unmoral."

The defendant Sprouse, when on the witness stand, denied that he made the remarks with reference to the plaintiff as testified to by Carter and Hewitt. He stated, however, that he saw the plaintiff at the store on the date named. He said, as set out in the record: "She came in the store. I did not know her then. I saw her whispering something to Mr. Carter." He further testified that after he finished taking an inventory, he went to St. George, and that upon his return in the afternoon he saw the plaintiff in the store with a bottle of beer in her hand and that she and a man were drinking; that after these two left, he called Carter out to the front, and "asked him who that woman and man were

in the back room just now," and upon being told that they were Mr. and Mrs. Culler, that the witness called to Carter's attention that it was against the rules of the company to permit any one to go back in the ware room and told him to discontinue the practice; and that nothing else was said about it.

As is seen, Sprouse, according to his own testimony, was at the store on the morning of the day in question, and there saw the plaintiff, who was a stranger to him, "whispering something to Mr. Carter," the local manager. Also, after he had finished taking an inventory, he went to St. George, and upon his return in the afternoon saw the same woman in the back room of the store, with a bottle of beer in her hand, drinking with a man whom the witness did not know. In this situation, he called the local manager to him out at the front, and spoke to him, according to Carter's testimony, which was corroborated by Hewitt, in language to this effect: "Who is that damn woman in there, and what in the hell is she doing hanging around here?"

It seems clear, upon a careful examination of the record, that the testimony, when properly considered and analyzed, required the submission of the case to the jury. In other words, the Court should have held that the remarks claimed to have been made by the defendant Sprouse with reference to the plaintiff were fairly susceptible, under the facts and circumstances testified to, of the defamatory meaning put upon them by the innuendo; and that it was for the jury to determine whether such words were uttered by Sprouse—which he denied—and whether he intended, if he did speak them, that they should have the meaning ascribed to them by the plaintiff, and were in fact so understood.

In Newell on Slander and Libel, page 145, the writer says: "It is not necessary that the words should make the charge in express terms. They are actionable if they consist of a statement of matters which would naturally and presumably

be understood by the hearers as a charge of the offense. There is no offense which can be conveyed in so many multiplied forms and figures as that of incontinence. The charge is seldom made, even by the most vulgar and obscene, in broad and coarse language. If the language used is such that in its ordinary acceptation a person of ordinary understanding could not doubt its signification it will be *prima facie* sufficient."

Counsel for the respondents point out in their argument that this action was not brought until after Carter, the local manager, and the plaintiff's chief witness, had been discharged by the defendant company. Attention is also called to the fact that numerous witnesses testified that the reputation of the defendant Sprouse "for truth, veracity, and for kindly and gentlemanly conduct toward others, was good."

Of course, these are matters which may properly be considered by the jury in determining whether, as a matter of fact, Sprouse made the remarks concerning the plaintiff as testified to by Carter and Hewitt.

The order appealed from is reversed and the case remanded for a new trial.

MESSRS. JUSTICES CARTER, BONHAM, BAKER and FISHBURNE concur.